UNITED STATES, Appellee

v

WOODY P. STRAUB, Hospitalman,
U. S. Navy, Appellant

12 USCMA 156, 30 CMR 156

No. 14,370

Decided January 27, 1961

Lieutenant Colonel M. G. Truesdale, USMC, argued the cause for Appellant, Accused.

Lieutenant John W. Boult, USNR, argued the cause for Appellee, United States.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

This near tragedy commenced with the accused drinking. alcoholic beverages and ended with his use of one of the glass containers as a shillelagh.

For his part in the venture, the accused was charged with assault with a dangerous weapon and being drunk and disorderly in hospital quarters, in contravention of Articles 128 and 134, Uni-

form Code of Military Justice, 10 USC §§ 928 and 934, respectively. He was found guilty as charged and sentenced to a bad-conduct discharge, confinement at hard labor for six months, and reduction to hospital recruit. The convening authority approved the findings and sentence except he reduced the period of confinement to four months and suspended the execution of the bad-conduct discharge with provision for automatic remission. Intervening authorities affirmed and thereafter we granted accused's petition for review to consider certain issues which will be set forth specifically in the subsequent discussion.

The first asserted error is that the evidence is insufficient as a matter of law to support the findings. We believe a short resumé of the facts will show this assignment is without merit. The locale of the altercation was on the second floor of a Hospital Corps barracks. By the use of lockers and temporary partitions, the building was divided into small compartments or cubicles which were occupied by one or more corpsmen. About one o'clock in the morning, a hospitalman named McGuire, who occupied a cubicle with the victim, was awakened by loud talking from across the corridor. He recognized the voices and heard the accused trying to persuade another hospitalman to get up and accompany him to a lower floor to engage in a fight with the servicemen sleeping on that level. The accused met with little success, and he gave vent to his disappointment by calling the other party a coward. As he departed from this room to enter the one in which the victim and McGuire lived, he turned on the light in the compartment he was leaving. He repeated his prior performance in this second compartment by disturbing McGuire, inquiring with regard to his courage and importuning him to go below and engage in a fight with the persons living in that area. When McGuire refused and expressed a desire to go back to sleep, he too was called a coward. The accused thereupon walked out of this cubicle but, as he was leaving, he turned on a drop

**158**

light. The illumination, together with the loud talking, awakened the victim who called to the accused and told him to turn off the light. The accused replied by notifying the victim to turn it off himself. The victim made several demands with no success, so he arose from his bed and stalked the accused to the entrance of the next cubicle. Two other men were billeted in that compartment, but neither was present. As the victim approached the accused, he noticed the latter was holding a beer bottle, which at first glance appeared to the victim to be in a position for drinking but which was immediately shifted and lifted into a striking position. The victim made a lunge for the weapon and, during the course of the struggle, was hit on the head with sufficient force to shatter the bottle. Seven stitches were required to close the wounds on his head and neck.

Conceding that there is some discrepancy in the testimony of the victim as to whether he was struck as the fight commenced or while struggling on a bed, that is understandable because he was too busily engaged in the fight to observe meticulously each and every detail. However, discrepancies may be resolved by the triers of fact, and here one witness who did not see the start of the fight but was awake and within hearing distance testified he heard the breaking of glass before he heard the scuffling of the combatants. In addition, the two witnesses who entered the compartment and noticed the victim striking the accused stated the victim had been struck before they arrived. From this record the court-martial members could conclude either that the victim was struck prior to or as he was attempting to disarm the accused or later on in the combat. But, more important, all witnesses are in agreement that the victim was not armed, the bottle was broken, the parts were on the bed and floor, the victim was covered with blood, and his scalp and neck were cut. Moreover, when the first nonparticipants reached the cubicle, the victim was bleeding profusely. At this time, the combatants were locked in a struggle on a bed and the accused was on the bottom, ap-

parently not faring too well. The fight was broken up by the first arrivals, and the participants policed themselves. The accused went to bed, and the victim to the hospital. Three witnesses testified the accused was under the influence of liquor.

From the above related facts we conclude that a finding of an assault with a dangerous weapon and being drunk and disorderly in quarters is supportable by the evidence. Accordingly, the assignment based on insufficiency of the evidence is resolved against the accused.

The principal error asserted by appellate defense counsel questions the propriety of the instruction on self-defense given by the president of the court. The instruction is hereinafter quoted in full:

"The court is further advised that the question of self defense has been in issued [sic] by the evidence with respect to the offense. You are advised that a person may lawfully meet force with a like degree of force in protecting himself. However, a person may use force likely to result in grievous bodily harm only when retreat by him is not reasonable [sic] possible or would endanger his own safety, or when he is in his own home or at a place of duty where he is required to remain. Therefore, to avail oneself use force in defense of himself the person must not have been the aggressor or intentionally provoked the altercation with the victim; but, if after provoking a fight, the person withdraws in good faith and his adversary follows and renews the fight, he is no longer the aggressor and may avail himself of the right of self defense. The burden is on the prosecution to establish the accused's guilt by legal and competent evidence beyond a reasonable doubt. Self defense is a complete excuse for assault. Consequently, unless you are satisifed [sic] beyond a reasonable doubt that the accused did not act in self defense, you must find the accused not guilty of the charge. Furthermore, the accused is excused

for assaulting in self defense if he believed on reasonable gounds [sic] that the assault was necessary to save his own life, or to prevent great bodily harm to himself. To be excused for such an assault, a person must have believed or [sic] reasonable grounds that the danger of being killed or of receiving great bodily harm was imminent."

As an abstract matter, even a cursory reading discloses inaccuracies in the charge as given but in the factual background of this altercation the inexact principles are nonprejudicial. In making that assertion we are taking the position that the victim was the aggressor although there is good authority for the proposition that when the accused raised the bottle to a striking position within effective distance of the victim he committed an assault. As to the necessity for using the bottle as a club, the accused did not testify, and prior to trial he made no disclosure as to his belief that the use of a deadly weapon was necessary to ward off the possibility of being injured seriously. Accordingly, any evidence to support that facet of self-defense must be inferred from the evidence presented by the victim as the third parties came on the scene after the blow had been struck. Furthermore, the testimony of all witnesses shows conclusively that the means used by the accused to protect himself were likely to inflict serious bodily harm. Thus, we are not concerned with whether the instruction will stand close scrutiny on homicide or ordinary assault and battery cases, for the charge given in this instance must be measured by the rule applicable in those cases where the defensive force is likely to produce grievous bodily harm.

The appellant complains first about the statement that a person may lawfully meet force with a like degree of force. In United States v Weems, 3 USCMA 469, 13 CMR 25, we found no fault with this language for it is no more than expressing in different

**159**

words the concept that the extent of the force that may lawfully be used in the defense of the person must be governed by the violence and nature of the act of the assailant. Generally speaking, a person is not entitled to use a dangerous weapon in self-defense where the attacking party is unarmed and commits a battery by means of his fist. And if he uses more force in any defense of his person than the law will allow, he becomes the aggressor. The theory of self-defense is protection and not aggression, and to keep the two in rough balance the force to repel should approximate the violence threatened. In the usual case, instructions are given which show that the degree of force permitted to the defender need not be identical with the means employed by the assaulter. That is true here for the president instructed that the accused should be excused if he used only the force which reasonably appeared to him to be necessary to protect himself from impending danger. Of course, no one expects detached reflection under conditions of stress or in fast moving situations, but some degree of equality between the offensive and defensive forces is required by law. That is the principle enunciated in the questioned portion of the instruction and, when considered with the remaining part of the charge, there is no fair risk that the court-martial understood the principle to mean that the defender was limited to absolute identical force threatened by the assaulter.

For the purpose of presenting the next issue we combine the asserted errors that the president prejudiced the accused when he failed to require the court-martial to ascertain whether the accused used excessive force in repelling the assault and made accused's plea of self-defense contingent on a belief upon reasonable grounds that the force used was necessary to save the accused's life or to prevent himself from being subjected to great bodily harm. The accused would prevail on those assignments and the errors would be prejudicial if the facts

did not show conclusively that the accused used force likely to result in grievous bodily injury. There is no lesser assault offense raised reasonably by the evidence, and so we test the instruction not abstractly but by the facts of this case. Here the accused is guilty of assaulting with a dangerous weapon unless upon reasonable grounds he believed that striking the victim with the bottle was necessary to prevent himself from receiving great bodily harm. Certainly that is the only issue in this case and that finding was permitted by the following portion of the instruction:

". . . Consequently, unless you are satisifed [sic] beyond a reasonable doubt that the accused did not act in self defense, you must find the accused not guilty of the charge. Furthermore, the accused is excused for assaulting in self defense if he believed on reasonable gounds [sic] that the assault was necessary to save his own life, or to prevent great bodily harm to himself. To be excused for such an assault, a person must have believed or [sic] reasonable grounds that the danger of being killed or of receiving great bodily harm was imminent."

Obviously if he did not believe reasonably that he had to use the bottle as a weapon to protect himself from serious injury he used excessive force, as a matter of law, in repelling the victim. Accordingly, we are certain that the instructions contained sufficient guideposts to present properly the only defense in issue.

There is no merit to the last contention that the president of the court improperly defined the word drunkenness as it is used in the proscribed offense of being drunk and disorderly in violation of Article 134 of the Uniform Code, supra. He advised the court members that:

". . . 'Drunkenness' means any intoxication which is sufficient sensibly to impair the rational and full exercise of the mental and physical faculties."

This is but a minor variation in the language found in Webster's New International Dictionary, Second Edition, page 792. As therein defined, a person is drunk who is:

". . . under the influence of an intoxicant, esp. an alcoholic liquor, so that the use of the faculties is materially impaired. . . ."

In United States v Bull, 3 USCMA 635, 14 CMR 53, the law officer gave a similar instruction, charging the court that " 'any intoxication which is sufficient sensibly to impair the rational and full exercise of the mental and physical faculties is drunkenness. In other words, there must be no . . . deterioration of the accused's physical ability to act like a normal rational person.' " The second sentence of that instruction—not given in the case at bar—was there assailed as incorrect, and we stated:

". . . With the exception of the questioned sentence, the instruction is in the exact words of the Manual and in effect it declares that a sensible impairment of the faculties is an impairment capable of being perceived by the senses. If the accused's conduct is not such as to create the impression within the minds of observers that he is unable 'to act like a normal rational person,' there can be no sensible impairment of his faculties. If, because of intoxicating liquors, there was a perceptible lessening of accused's ability to act like a normal rational person, then it may be said that accused's faculties were sensibly impaired."

The evidence in support of this specification shows clearly that accused's condition was such that his intoxication could be perceived readily by other persons and colloquially speaking he was proved to be a drunken barracks nuisance who created a great deal of disorder. We therefore overrule this assignment.

For the foregoing reasons the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

FERGUSON, Judge (dissenting):

I dissent.

While I agree with Judge Latimer that the evidence is sufficient to support the findings of guilty of the offenses charged, I am unable to concur in his view that the instructions regarding self-defense are sufficient.

Tried by special court-martial, the accused was found guilty of assault with a dangerous weapon, in violation of Uniform Code of Military Justice, Article 128, 10 USC § 928, and being drunk and disorderly, in violation of Code, supra, Article 134, 10 USC § 934. He was sentenced to bad-conduct discharge, confinement at hard labor for six months, and reduction to hospital recruit. With some reduction in the confinement adjudged and suspension of the punitive discharge, intermediate appellate authorities affirmed. We granted review on issues regarding the sufficiency of the evidence to support the findings of guilty and the propriety of the president's instructions.

According to the evidence adduced at the trial, accused entered a cubicle in the hospitalmen's quarters at the United States Naval Hospital, Corpus Christi, Texas. These "cubicles" were rooms separated by partitions extending almost to the ceiling and closed off from a common hall by movable lockers. The cubicle which accused first entered was occupied by one Roberts, a fellow hospitalman. Accused attempted to persuade Roberts to accompany him to another floor in the hospital quarters in order to participate in a fight to which he had allegedly been challenged. The conversation was characterized as loud and awakened McGuire, another corpsman, who lived in a cubicle across the hall. Roberts eventually refused to accompany accused, and he entered McGuire's cubicle. It was shared by one Flores, the eventual "victim."

Accused immediately engaged McGuire in conversation and sought to have him join in the proposed brawl. McGuire refused and, after some ar-

gument, accused departed. As he was leaving the cubicle, he switched on the overhead light.

Flores, who had been awakened, directed the accused, in strident tones, to return to the cubicle and extinguish the light. Accused yelled back from the hallway, "Turn them out yourself," and entered yet another cubicle in which he also turned on the light. He then went into a fourth cubicle, quickly followed by Flores. There, Flores repeated his demand that the accused return and cut off the lights. At that time, accused had a beer bottle in his left hand "in a position to use to drink from." When "he . . . shifted it around into his right hand to hold it as if it was a handle, and . . . started to lift it up in the air," Flores grabbed accused's hand, and they fell across one of the beds in the cubicle. While Flores was on top of accused, the latter somehow managed to shift the bottle to his left hand again and struck Flores on the head. The bottle was then dropped, and Flores, pinning accused to the bed, proceeded to strike him repeatedly with his fists. McGuire and another hospitalman intervened and ended the fight. Flores was taken to the dispensary for treatment of the cuts which he sustained from the blow with the bottle, and the accused went first to the latrine and then to the dispensary to inquire concerning Flores' condition. Although the evidence is in conflict, there is substantial proof in the record tending to indicate that the accused was intoxicated during the entire affair.

There can be no doubt that the foregoing evidence raised an issue of self-defense for resolution by the court-martial. United States v Weems, 3 USCMA 469, 13 CMR 25. The state of the proof permitted its members to conclude that Flores followed the accused from his own cubicle into the adjoining chamber, grabbed his arm, threw him on the bed, and struck him repeatedly. It could also have found that the accused reasonably thought it necessary to strike Flores with the beer bottle in order to escape serious physical punishment. True it is that there is other evidence from which the court-martial could conclude that Flores was only "wrestling" with accused and engaged in that behavior solely in order to avoid being clubbed with the bottle. It is not, however, our duty to resolve these conflicts in the proof, for Congress has wisely left fact-finding to other tribunals. Code, supra, Article 67, 10 USC § 867; United States v Caillouette, 12 USCMA 149, 30 CMR 149. Instructions are required if the evidence in the record reasonably raises an issue concerning an affirmative defense. United States v Morphis, 7 USCMA 748, 23 CMR 212; United States v Backley, 2 USCMA 496, 9 CMR 126. It is clear that it does so here. Indeed, the principal opinion recognizes that an issue regarding self-defense was raised and merely reaches the conclusion that the instructions thereon were sufficient.

Turning to the advice of the president, I find that the following represents his entire instructions on the subject in controversy:

"The court is further advised that the question of self defense has been in issued [sic] by the evidence with respect to the offense. You are advised that *a person may lawfully meet force with a like degree of force in protecting himself. However, a person may use force likely to result in grievous bodily harm only when retreat by him is not reasonable [sic] possible or would endanger his own safety, or when he is in his own home or at a place of duty where he is required to remain.* Therefore, to avail oneself to use force in defense of himself the person must not have been the aggressor or intentionally provoked the altercation with the victim; but, if after provoking a fight, the person withdraws in good faith and his adversary follows and renews the fight, he is no longer the aggressor and may avail himself of the right of self defense. The burden is on the prosecution to establish the accused's guilt by legal and competent evidence beyond a reasonable doubt. Self defense is a complete excuse for assault. Consequently, unless you are satisifed [sic] beyond a reasonable doubt that

the accused did not act in self defense, you must find the accused not guilty of the charge. *Furthermore, the accused is excused for assaulting in self defense if he believed on reasonable gounds [sic] that the assault was necessary to save his own life, or to prevent great bodily harm to himself. To be excused for such an assault, a person must have believed or [sic] reasonable grounds that the danger of being killed or of receiving great bodily harm was imminent.*

. . . . .

"Additional instructions to the court is as follows: A person may use force likely to result in grievous bodily harm when he is at the place of abode which may include a hotel room, an apartment, a building, or a barracks where he sleeps and keeps his private possessions." [Emphasis supplied.]

In my opinion, the foregoing instructions are prejudicially erroneous. Initially, I point out that the entire advice is no more than a generalized and confused lecture on the subject of the law of self-defense, into which every possible concept is lumped without any regard to the offense before the court-martial or the circumstances alleged and proved. This Court has repeatedly insisted that instructions be tied to the factual situation involved and has inveighed against such general declamations on the law in which an attempt at erudition is made, but only woeful ignorance betrayed. United States v Gilbertson, 1 USCMA 465, 4 CMR 57; United States v Ginn, 1 USCMA 453, 4 CMR 45; United States v Simmons, 1 USCMA 691, 5 CMR 119. How the members of this court-martial could have separated out the inconsistent and inapt matter and applied the remaining principles to the evidence before them is simply beyond my comprehension. It may be that so to require the president of a special court-martial to instruct upon technical matters with the precision of a trained judicial officer is to impose upon him a heavy burden. Nevertheless, that is the mandate of the Congress, and I believe his instructions

must be measured as if he were the law officer of a general court-martial. Code, supra, Article 51, 10 USC § 851; United States v Pinkston, 6 USCMA 700, 21 CMR 22. With that standard in mind, I am unable to conclude that the advice here with respect to self-defense conveyed any meaningful concept to the court members. For this reason alone, reversal should follow.

Turning from the instructions as a whole to the specific matters covered, two other bases for findings of prejudicial error immediately present themselves. In United States v Weems, supra, we pointed out that the inclusion in an instruction on self-defense of principles relating to the right of an accused to take his opponent's life was harmfully incorrect when the matter before the court-martial involved only the question of his privilege to repel an assault. Of an instruction similar to that here, we said, at page 473:

"This language, of course, compounded the error. It is clear that it requires consideration of two elements which have no relevance whatever to the facts of the instant case. One of these is a belief by the accused, based on reasonable grounds, that the killing was necessary to save his own life, or to prevent great bodily harm to himself. The other demands the finding of a retreat by him in so far as it might be accomplished in safety. By predicating the defense of excusable homicide on these two factors, the law officer failed to discriminate between the law of homicide governing intentional killing in self-defense, on the one hand, and on the other, the principles controlling the right to repel force with equal force in cases of assault and battery."

The principle thus announced in United States v Weems, supra, is clearly applicable here. The president's instructions, as set out above, introduced into the case concepts of the law regarding the use of self-defensive force which apply only in the case of an intentional killing. Not only was there no homicide involved in the charges, but the accused at no time sought to

**163**

allege that the blow which he struck was necessary to save his life. Hence, when the president's advice spoke of the necessity that the accused reasonably believe that "the assault was necessary to save his own life, or to prevent great bodily harm to himself," he introduced into the case legal concepts which were entirely foreign to the solution of the issues. Under the circumstances, "it is inescapable that . . . [the instruction] operated to produce more than a fair risk of prejudice to petitioner." United States v Weems, supra, at page 473.

The final error which I perceive in the president's advice is found in that portion of his instructions which informed the court members that the accused was limited to meeting the victim's force "with a like degree of force in protecting himself." Considered alone, or in connection with other portions of the instruction, the clear implication of the president's language was that the accused could meet a fistic assault only by using his fists and that the use of a beer bottle to repel Flores was *per se* excessive. That the law is to the contrary cannot be doubted. Lujan v United States, 209 F2d 190 (CA 10th Cir) (1953). It may be true that repelling an unarmed attack does not ordinarily justify the use of a deadly weapon. Josey v United States, 135 F2d 809 (CA DC Cir) (1943). This, however, is no more than a statement of the inference normally to be drawn from the circumstances surrounding the usual assault, and the true rule is simply whether the use of such a weapon was reasonable in light of all the circumstances. 6 CJS, Assault and Battery, § 92; 4 Am Jur, Assault and Battery, § 51; State v Brooks, 172 Wash 221, 19 P2d 924 (1933); Murray v State, 13 Ala App 175, 69 So 354 (1915). The rationale behind the refusal so to limit an accused in repelling an attack upon his person is succinctly set forth in Davis v State, 152 Ind 34, 51 NE 928 (1898), at page 929:

"... These instructions inform the jury that a person assaulted by another, who has no weapon in his hands, or the appearance thereof, is not justified in using a deadly weapon in defense of his person. If that is the law, then, in every conceivable case of a violent attack upon one by another,—no matter what the circumstances may be, no matter what the disparity between the ages and physical strength of the two may be,—the assaulted party must stand and take his chances of being knocked down and stamped into a jelly, or of being choked to death, before he can lawfully use a weapon in his defense. Though the appearance and circumstances of the assault were such as to induce the reasonable belief to be honestly entertained by the defendant that his life was in danger, or that he was in danger of great bodily harm, from the assault, he could not lawfully use a deadly weapon to repel such assault, unless the assailant had a weapon in his hands, or the appearance thereof, no matter how many he had about his person. That is not the law."

The same reasoning applies to the advice now before us. The members of the court-martial could draw no meaning from the injunction regarding the meeting "of force with a like degree of force" other than that the accused was limited to his fists in resisting Flores' attack. Thus, his use of the beer bottle was *per se* excessive. In my opinion, the law imposes no such burden upon the accused. Rather, the members should have been informed that their task lay in determining whether the accused's resort to the bottle as a weapon constituted the use of reasonable means under the circumstances. Davis v State, supra; Lujan v United States, supra. As the contrary advice of the president placed an insuperable obstacle in the accused's path with respect to the issue of self-defense, it is clear that prejudice is present and reversal required.

In sum, it appears to me that the president's instructions regarding the doctrine of self-defense were so defective as not to present the concept to the court-martial in any meaningful light. The advice is made up of a series of unrelated and ineptly phrased,

concepts which have little bearing on the question presented. It incorrectly included matter which related only to self-defense in homicide cases and it improperly limited accused's use of force to a "like degree of force." For these reasons, I am of the view that a rehearing must be ordered.

I would reverse the decision of the board of review and order a rehearing with respect to the offense of assault with a dangerous weapon or reassessment of the sentence on the remaining findings of guilty.